JOSEPH C. BENNET, JR., EXECUTOR, ETC.

V.

FIRST & MERCHANTS NATIONAL BANK, ET AL.

Record No. 840113

April 24, 1987

Present: Carrico, C.J., Cochran,* Poff, Compton, Stephenson, Russell, and Thomas, JJ.

* Justice Cochran participated in the hearing and decision of this case prior to the effective date of his retirement on April 20, 1987.

*Randolph W. Church, Jr. (Hunton & Williams*, on briefs), for appellant.

*Thomas Monahan (O. Leland Mahan; Hall, Monahan, Engle, Mahan & Mitchell*, on brief), for appellee, Mindy Louise Thompson.

No briefs or arguments for appellees, First & Merchants National Bank and Marilyn Diane Vetter.

RUSSELL, J., delivered the opinion of the Court.

This appeal requires us to determine whether an interest in a United States Treasury Bill, purchased with funds drawn from a joint savings account, becomes a part of the estate of the joint depositor who contributed the funds to the account but who dies

before the Treasury Bill matures, or whether it passes by survivorship to the surviving joint depositor.

The essential facts are undisputed. Taylor S. Butler, the decedent, had two children, Mindy Thompson and Marilyn Vetter. His personal relationship was good with each of them, and he treated them in an essentially equal fashion during his lifetime. His will, executed in 1982, after making certain specific bequests to others, divided the residue of his estate into two equal shares, one share for each daughter. One-fourth of the corpus of each share was to be distributed to its beneficiary as soon as practicable after decedent's death; the remaining three-fourths was to be held in separate spendthrift trusts administered for the benefit of the respective daughters over a period of 20 years, to be distributed to them during that period in the discretion of the executor and trustee appointed by the will, Joseph Campbell Bennet, Jr.

In February 1983, the decedent learned that he was suffering from a terminal illness. He conferred with his daughters and discussed his will with them, outlining his intentions concerning his assets. Two days after the conference, the decedent went with his daughter, Mindy Thompson, to an office of First and Merchants National Bank, where he opened a joint savings account (#9272 3971) with her. The decedent contributed all funds deposited in the account. The bank furnished a signature card which authorized the bank to recognize the signature of Taylor S. Butler or Mindy L. Thompson in the transaction of any business affecting the account. The card further provided:

> If the account is to be jointly owned, the parties must indicate the survivorship form desired by signing their names below:
>
> ☐ JOINT ACCOUNT — WITH SURVIVORSHIP
> 1. _____(SEAL)
> 2. _____(SEAL)
> 3. _____(SEAL)
>
> ☐ JOINT ACCOUNT — NO SURVIVORSHIP
> 1. _____(SEAL)
> 2. _____(SEAL)
> 3. _____(SEAL)

The decedent and Mindy Thompson signed lines 1. and 2., respectively, under "JOINT ACCOUNT — WITH SURVIVORSHIP." Neither box was checked.

A week later, the decedent, by codicil, made several changes in his will respecting specific bequests to others, but made no change in the residuary provisions for his daughters. He then told Bennet that his affairs were in order, except that he intended to make *inter vivos* cash gifts of $10,000 to each of his daughters. He thereafter made such gifts.

Muriel Bertrand, Mr. Butler's secretary, retained possession of the passbook and checkbook for the joint savings account. When Mr. Butler's personal bills arrived, Mindy Thompson took them to Mrs. Bertrand, who prepared checks in payment. Mindy Thompson signed the checks and Mrs. Bertrand mailed them to the creditors.

On March 1, 1983, the balance in the savings account exceeded $100,000. The decedent made arrangements with the bank to purchase a $100,000 Treasury Bill from the funds on deposit. At his request, on March 10, 1983, Mindy Thompson picked up the passbook from Mrs. Bertrand and took it to the bank to consummate the transaction. The bank debited the joint savings account with the purchase price of the Treasury Bill and obtained Mindy Thompson's signature on a "Security Buy Memo" which shows "Taylor S. Butler" as "customer" and "Mindy Thompson" as "co-owner." The "memo" described the security to be purchased as "1 T-Bill for 6 months @ $100,000.00" and instructed the bank to "Charge Account 9272 3971." It contained no words of survivorship. The bank's internal memoranda originally showed that the Treasury Bill was purchased "for the account of Taylor Scott Butler."

Mr. Butler died August 4, 1983, more than a month before the Treasury Bill matured. After his death, the bank issued a "corrected confirmation," reciting that it had purchased the Treasury Bill "as agent" for "Taylor Scott Butler or Mindy Thompson."

Treasury Bills are short-term obligations of the United States, which may be purchased at weekly auctions. In this case, the bank made weekly purchases of Treasury Bills in bulk from the Federal Reserve system, for the benefit of its customers. The Federal Reserve system retained physical custody of the Treasury Bills, which were issued in the bank's name. The bank maintained the internal records which reflected the interests of its respective cus-

tomers in the bulk purchases, which typically amounted to $1,000,000 to $20,000,000 per week. Thus, the only record of ownership signed by any party to this proceeding was the original "Security Buy Memo" described above, and the only other records evidencing ownership interests in the Treasury Bill were the bank's internal memoranda.

Mr. Butler had purchased Treasury Bills through the bank on prior occasions. The bank's practice had been simply to debit his account with the purchase price when the bills were purchased and to credit his account with the proceeds when they matured. Accordingly, when the Treasury Bill which is the subject of this case matured in September 1983, the bank was prepared to credit the proceeds to savings account 9272 3971.

On September 12, 1983, the executor filed a "Petition for Advice and Guidance" in the trial court, naming the bank and both daughters as respondents. The court entered a temporary restraining order to prevent disbursement of the proceeds of the maturing Treasury Bill until the case could be heard. The bank paid the funds into court and was dismissed as a party. After a hearing *ore tenus*, the court ruled that the Treasury Bill had been owned jointly by the decedent and Mindy Thompson, that the decedent had intended the right of survivorship to follow it, and that its proceeds therefore belonged to Mindy. The court ordered the clerk of the trial court to retain the funds on deposit pending this appeal. We granted an appeal to the executor.[1]

Our analysis begins with Code § 6.1-125.5(A) (Repl. Vol. 1983), which, if applicable, would be determinative. It provides, in pertinent part: "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created." That section is a part of Title 6.1, Chapter 2.1 of the Code, entitled "Multiple-Party Accounts." The chapter begins with § 6.1-125.1 (Repl. Vol. 1983), containing a series of definitions applicable throughout the chapter unless the context otherwise requires. Section 6.1-125.1(1) defines "account" as: "a contract of deposit of funds between a depositor and a financial

---

[1] Marilyn Vetter was represented by counsel at trial, but did not file a responsive pleading. She was not in default because the case was heard on an expedited basis within 21 days of its filing. She did not oppose her sister's claim. The executor, however, contended that the proceeds of the Treasury Bill belonged to the two testamentary spendthrift trusts.

institution, and includes a checking account, savings account, certificate of deposit, share account, and other like arrangement . . . ."

■ Mindy Thompson contends that the Treasury Bill was an "other like arrangement" within the meaning of § 6.1-125.1, and thus was an "account" controlled by § 6.1-125.5. We do not agree. The relationship between a financial institution and its depositor is that of debtor and creditor. The funds become the property of the bank immediately on deposit, and the bank becomes the debtor of the depositor. *Bernardini* v. *Central Nat. Bank*, 223 Va. 519, 521, 290 S.E.2d 863, 864 (1982). This relationship is prerequisite to the existence of any "contract of deposit," or "checking account, savings account, certificate of deposit, share account, [or] other like arrangement" included within the definition of "account" in Code § 6.1-125.1(1). In the present case, the funds on deposit in the decedent's account were removed by the bank, acting as his agent and at his direction, and were used to purchase an obligation of the United States which was due not to the depositor, but to the bank. The depositor had no contractual relationship with the United States; it was not his debtor. His contract of deposit was, and continued to be, solely with the bank. Thus, the Treasury Bill was not an "account" within the meaning of Title 6.1, Chapter 2.1, insofar as the joint depositors were concerned, and Code § 6.1-125.5 is, for that reason, inapplicable.[2]

■ The ancient common-law right of survivorship between joint tenants was abolished in Virginia by Code § 55-20 and its predecessors. Section 55-21, however, creates an exception "when it manifestly appears from the tenor of the instrument that it was intended the part of the one dying should then belong to the others." As noted above, the only "instrument" to which the depositors were a party, affecting their interest in the Treasury Bill, was the "Security Buy Memo." It contained no words evidencing an intent to create a right of survivorship. Thus, Code § 55-21 is also inapplicable.

---

[2] It is also evident that the Treasury Bill, purchased with funds removed from the joint account at the decedent's direction, was not a part of the "sums remaining on deposit at the death of a party to a joint account." For that reason, the many cases decided in this and other jurisdictions applying, distinguishing, and rebutting the "presumption of convenience" which arises when an ailing or infirm person opens a joint account with a person other than his spouse, are inapposite. Although argued orally and on brief, those cases relate to the rights of survivors in the funds *remaining on deposit* in a joint account.

■ We conclude that the relationship of the depositors to the Treasury Bill, an asset purchased by funds withdrawn from the joint savings account during the lifetimes of both joint depositors, is the same as their relationship to the funds withdrawn to make the purchase. Here, the statutory mandate is clear. Although the Treasury Bill was not the depositors' "account," within the meaning of Title 6.1, Chapter 2.1, their joint savings account was such an "account." They were, with regard to the funds on deposit therein, the bank's creditors. Accordingly, Code § 6.1-125.3(A) applied to the account during their joint lifetimes. It provides, in pertinent part: "A joint account belongs, during the lifetimes of all parties, to the parties in proportion to the net contributions by each to the sums on deposit . . . ."

■ Because the decedent had contributed all the funds on deposit in the joint account, the funds withdrawn from the account during his lifetime to purchase the Treasury Bill belonged solely to him. Any asset purchased with his funds at his direction is presumed to be his sole property in the absence of evidence that it was intended to be the subject of a gift, or unless he had made a different disposition by contract. *See Gifford* v. *Dennis*, 230 Va. 193, 198, 335 S.E.2d 371, 374 (1985) (presumption that one who advances purchase money is entitled to benefit of property purchased); *Smith* v. *Smith*, 200 Va. 77, 80, 104 S.E.2d 17, 20-21 (1958) (same, when title to property is placed in name of one whom person advancing funds has no legal duty to support); *Bullman* v. *Edney*, 232 N.C. 465, 468, 61 S.E.2d 338, 340 (1950) (presumption applies to personal property as well as to real property); *Makinen* v. *George*, 142 P.2d 910, 916-17 (Wash. 1943) (presumption applies to U.S. government bonds).

■ In this case, the effect was the same as if the decedent, during his lifetime, had directed his daughter to withdraw his funds and use them to purchase a valuable painting, or some other property, personal or real. In the absence of evidence of contrary intention, the article so acquired would be presumed to be his sole property during his lifetime, to become a part of his estate at his death. Here, there was no evidence of a contrary intention. Rather, all the evidence, including Mindy Thompson's testimony, was entirely consistent with the decedent's intention to cause an equal division of his property between his daughters at his death.

Because we conclude that the trial court erred in holding that the proceeds of the Treasury Bill were excluded from the dece-

dent's estate by the right of survivorship, we will reverse the judgment and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*